**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 20, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

OKLAHOMA DEPARTMENT OF
SECURITIES, ex. rel.  IRVING L.
FAUGHT, Administrator,

      Plaintiff - Appellee,

v.

MARVIN LEE WILCOX; PAMELA
JEAN WILCOX,

      Defendants - Appellants.

Nos. 10-6056 & 10-6057

OKLAHOMA DEPARTMENT OF
SECURITIES, ex rel. IRVING L.
FAUGHT, Administrator,

      Plaintiff - Appellee,

v.

ROBERT WILLIAM MATHEWS,

      Defendant - Appellant.

**Appeal from the United States District Court**
**for the WesternDistrict of Oklahoma**
**(D.C. Nos. 5:09-CV-00186-D and 5:09-CV-00185-D)**

Robert N. Sheets, (Robert J. Haupt with him on the briefs), of Phillips Murrah P.C., Oklahoma City, Oklahoma for Defendants – Appellants.

Amanda Cornmesser, (Gerri Kavanaugh with her on the briefs), for the Oklahoma Department of Securities, Oklahoma City, Oklahoma for Plaintiff – Appellee.

Before **BRISCOE**, Chief Circuit Judge, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.

**O'BRIEN**, Circuit Judge.

At the behest of the Oklahoma Department of Securities, Oklahoma courts found early investors in a Ponzi scheme carried out by a third party to have been unjustly enriched and required disgorgement. Judgments were entered against those investors. We must decide whether the judgments entered against Robert Mathews, Marvin Wilcox, and Pamela Wilcox qualify as a nondischargeable debt under 11 U.S.C. § 523(a)(19). The bankruptcy court decided the debts were nondischargeable because they were "for a violation" of securities laws. The district court affirmed. We reverse and remand for further proceedings.[1]

## I. BACKGROUND

In 2005 Marsha Schubert pled guilty to crimes related to a Ponzi scheme[2] she used

---

[1] Our jurisdiction derives from 28 U.S.C. § 1291.

[2] A Ponzi scheme is:

[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, usu. without any operation or revenue-producing activity other than the

- 2 -

to defraud multiple investors of funds totaling over nine million dollars. Her activities violated the Oklahoma security laws. Robert Mathews and the Wilcoxes were investors in Schubert's Ponzi scheme. After Schubert's conviction, the Oklahoma Department of Securities (the Department) sued over 150 of her investors, including Mathews and the Wilcoxes, to recoup funds distributed in the Ponzi scheme on the grounds of unjust enrichment, fraudulent transfer, and equitable lien. The Department later requested summary judgment only on the basis of unjust enrichment. The Oklahoma trial court granted summary judgment requiring Mathews and the Wilcoxes to repay profits of approximately half a million dollars each. The Wilcoxes, but not Mathews, unsuccessfully appealed to the Oklahoma Court of Civil Appeals and subsequently to the Oklahoma Supreme Court, which reversed and remanded for further proceedings.[3] *See Okla. Dep't. Sec. v. Blair et al*, 231 P.3d 645, 670 (Okla. 2010).

Mathews and the Wilcoxes (collectively the Debtors) filed for bankruptcy protection and the Department initiated adverse proceedings to avoid discharge of the

---

continual raising of new funds. This scheme takes its name from Charles Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston.

Black's Law Dictionary 1198 (8th ed. 2004).

[3] The Oklahoma district court ordered the return of all profits, without exception. The Oklahoma Supreme Court, however, determined repayment of profits paid to innocent investors was appropriate only if the early investors had received an unreasonable rate of return and remanded so the state trial court could apply the new standard. *See Okla. Dept. of Sec. v. Blair*, 231 P.3d 645, 669 (Okla. 2010)**.** On remand, the trial court entered an order declining to apply the standard to the Wilcoxes because it concluded, while not accused directly of securities violations, they were not innocent investors. The Oklahoma Supreme court affirmed this decision. *See Okla. Dep't. of Sec. v. Wilcox*, 267 P.3d 106, 111 (Okla. 2011).

- 3 -

judgment debt. The bankruptcy court consolidated the cases and granted summary judgment to the Department, concluding the debts were not dischargeable because they fell under the exception in 11 U.S.C. § 523(a)(19) as judgments for the violation of securities laws. The district court affirmed. The Debtors appeal from the district court's judgment.[4]

## II. DISCUSSION

We review the bankruptcy court's interpretation of a statute de novo. *In re Troff*, 488 F.3d 1237, 1239 (10th Cir. 2007).

The Supreme Court

has certainly acknowledged that a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt. But in the same breath that . . . [it] ha[s] invoked this fresh start policy, . . . [it] ha[s] been careful to explain that the Act limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor.

*Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (citation and quotation omitted).

"Exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor." *In re Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008) (quotation omitted).

Under 11 U.S.C. § 523:

(a) A [bankruptcy] discharge . . . does not discharge an individual debtor from any debt--

---

[4] Our review calls for us to look past the district court's opinion to that of the bankruptcy court. *See In re Paul*, 534 F.3d 1303, 1310 (10th Cir. 2008).

(19) that--

(A) is for--

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws . . . .

The burden is on the creditor to show a debt is nondischargeable under § 523(a). *Grogan*, 498 U.S. at 283. "Section 523(a)(19) discharge exceptions are often defined by law external to the Bankruptcy Code." *In re Lichtman*, 388 B.R. 396, 409 (Bankr. M.D. Fla. 2006).

There is a valid state court judgment against the Debtors, entered to require them to repay profits distributed to them as a result of Schubert's Ponzi scheme. The only dispute is whether such a judgment qualifies as one "for a violation" of securities laws under § 523(a)(19). The Department argues the state court judgment is "for the violation" of securities laws because the disgorgement was a direct result of Schubert's violation of securities laws and because the Debtors materially aided in the violation.[5]

_____

[5] Although the Department argued the debts were nondischargeable under 523(a)(2)(A) in the bankruptcy proceeding it has limited itself on appeal to arguing under 523(a)(19). The Debtors claim the bankruptcy and district courts ignored disputed issues of fact regarding their level of culpability; the Department makes much of their purported complicity with Schubert's scheme. However, the level of culpability of the debtors has no bearing on our interpretation of 523(a)(19), which only requires us to determine if the judgments at issue are for a violation of securities laws. The Department chose not to prosecute Mathews or the Wilcoxes for securities violations. *See Blair*, 231 P.3d at 652 ("In the trial court the Department explained that it made no allegation that the defendants violated the securities statutes or materially aided in the violation of those statutes."). Our task is not to determine whether they committed such violations but whether the judgment against them is "for" securities violations. We therefore focus not

The Debtors contend the judgment is not a debt incurred "for the violation" of securities laws because they have never been charged with such violations.

> [W]e begin with the understanding that Congress says in a statute what it means and means in a statute what it says. . . . [W]hen the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (quotations and citations omitted).  These debts do not fall under the 523(a)(19) exception according to the plain language of the statute.  The judgments at issue are not "for a violation" of securities laws but for unjust enrichment resulting from someone else's violation of those statutes. [6]  Although the Department argues such unjust enrichment is a violation of the securities laws, the Oklahoma Supreme Court clearly stated "[t]he defendants were not charged with securities violations."  *Blair*, 231 P.3d at 650.

During oral argument, the Department attempted to analogize this case to *McKowen v. IRS*, in which we concluded nondischargeable debt "for a tax" included a transferee's liability to pay taxes assessed to his defunct business.  370 F.3d 1023 (10th Cir. 2004).  We determined the transferee tax liability was still primarily for a tax

---

on the underlying facts but on the nature of the judgments at issue.  The Wilcoxes' appeal (or Mathews' lack thereof) in Oklahoma does not affect our decision because the Oklahoma Supreme Court focused on whether the parties had been unjustly enriched, a completely different question.

[6] The Oklahoma Supreme Court rejected an explicit grant of power in the securities statutes as a basis for jurisdiction in the underlying action basing the Department's right to recovery entirely in equity.  *Blair*, 231 P.3d at 652, 661.

- 6 -

notwithstanding the fact that responsibility for it had been transferred.[7] *Id.* In contrast, the debtors' liability in the instant case was never for a violation of securities laws but only for unjust enrichment. It is not a single type of liability that was transferred from one party to another, as in *McKowen*, but a completely different type of liability.

Examining the history behind the statute does not lead us to a different conclusion. 11 U.S.C. § 523(a)(19) was enacted as part of the Sarbanes-Oxley Act in 2002. The Senate Report on the draft legislation indicates it was enacted to address perceived loopholes in securities laws after the Enron debacle.[8] The early language of § 523(a)(19)(A) excepted from discharge a judgment that "arises under a claim relating to" securities violations. S. Rep. No. 107-146 at 27. The language was subsequently changed to except a judgment that "is for" securities violations. 11 U.S.C. § 523(a)(19)(A).

The Department relies heavily on the Senate Report as indication that the law was

---

[7] Additionally, in *McKowen* we were faced with the need to interpret the bankruptcy provisions in a manner that did not run afoul of seemingly conflicting provisions of the tax code, which dictated transferred tax liability be collectible "in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred." *Id.* at 1027 (quotation omitted). Here, our interpretation of the exception to discharge, which must be construed narrowly, is constrained by no such conflict.

[8] Current bankruptcy law permits wrongdoers to discharge their obligations under court judgments or settlements based on securities fraud and other securities violations. This loophole in the law should be closed to help defrauded investors recoup their losses and to hold accountable those who incur debts by violating our securities laws.

S. Rep. No. 107-146 at 8.

intended to "help defrauded investors recoup their losses . . . ." S. Rep. No. 107-146 at 8. Assuming the report could be a useful tool of statutory construction, it is of little help to the Department as it consistently refers to "hold[ing] accountable those who incur debts by <u>violating</u> our securities laws" and explains "the bill protects victims' rights to recover from <u>those who have cheated them</u>**."** *Id.* at 8, 11 (emphasis added). It is evident from the text of § 523(a)(19)(A) that Congress intended to penalize the <u>perpetrators</u> of such schemes by denying them relief from their debts. Adopting the Department's interpretation would impose the heavy penalty of nondischargeability on violators and nonviolators alike. That Congress intended such an extreme result is evident neither in the text of the statute[9] nor in the historical record.

The Department cites an unpublished order in *Crawford v. Myers*, No. 09-1211 (Bankr. D. Colo., July 20, 2009, Order on Motion to Dismiss Complaint)[10] and *SEC v. Sherman*, 406 B.R. 883 (C.D. Cal. 2009). The judge in the *Myers* case concluded the statute was intended to reach innocent investors. As we have explained, we do not believe the statute supports such a reading. Similarly, the debtor in *Sherman* "had obtained funds derived from a [third party's] violation of federal securities laws to which

---

[9] The Department points out the statute uses language limiting exceptions to actions "by the debtor" in other sections and that no such limitation is imposed here. This is a valid point but doesn't answer the basic question of whether the underlying judgment was "for a violation" of securities laws. The judgments at issue here were not part of the proceedings instituted against Schubert but were an entirely separate action. The funds were to be disgorged because they were unfairly distributed to the recipients, not because the recipients violated securities laws.

[10] *Myers* was eventually dismissed on stipulation after settlement.

he had no legitimate claim of ownership." *Id.* at 885. The bankruptcy judge determined the debt was dischargeable but the district court reasoned the SEC was merely reaching through the debtor to collect assets in which the debtor had no equitable interest and cited the bankruptcy decision in this case, concluding the repayment order was a nondischargeable debt in part because to permit discharge would "frustrate the ability of the SEC to enforce federal securities laws." *Id.* at 887.

Following the briefing and oral argument in the case before us, however, the Ninth Circuit reversed the district court's decision in *Sherman*. *Sherman v. SEC*, 658 F.3d 1009, 1010 (9th Cir. 2011). Recognizing the merits of the same arguments made by the dissent here, the court nonetheless concluded the narrow construction applied to discharge exclusions and the purpose of bankruptcy to provide a fresh start to honest but unfortunate debtors precluded a reading of the statute to include debtors who are not charged with securities violations. Id. at 1015-16. Similar to the situation here, Sherman was not necessarily an "innocent" in acquiring the funds he was ordered to disgorge, but he had not been accused of a securities violation. As the court noted:

> [If the third party in question has actually aided or abetted a securities violation, that party may be prosecuted for a violation of securities laws in addition to the primary violator. . . . If a creditor can show that a debtor has concealed property or funds from the bankruptcy court, a discharge can be denied in its entirety, 11 U.S.C. § 727(a)(2), or revoked after it is granted, 11 U.S.C. § 727(d). . . . In short, the Bankruptcy Code already includes protections against attempting to conceal assets or defraud creditors, or otherwise failing to disgorge available assets. There is no additional need for us to expand the scope of § 523(a)(19) to cover innocent debtors in order to accomplish this goal.

*Id.* at 1018.

Although the Department claims these debtors are not innocent parties, it declined to prosecute them for securities laws violations. Had it done so successfully, any judgment it obtained would no doubt be considered nondischargeable under § 523(a)(19). Instead, it argues these debts are immune from discharge merely because <u>someone</u> violated the securities laws and they coincidently profited. Permitting debtors, who were not personally found to be in violation of securities laws, to obtain relief from a judgment intended only to redistribute funds among multiple victims of a Ponzi scheme is in accordance with the plain language of the statute. It in no way frustrates the ability of the various securities regulators to carry out their responsibilities or to bring proceedings against violators.

The Department's position conveniently serves its ends and perhaps (in the abstract) a public good. But the language of the statute cannot reasonably be stretched that far.

**REVERSED** AND **REMANDED** to the Bankruptcy Court for further proceedings.

10-6056, <u>In re Wilcox</u> and 10-6057, <u>In re Mathews</u>

**BRISCOE**, Chief Judge, dissenting.

I respectfully dissent. In my view, the majority errs in two important respects. First, and most significantly, the majority misinterprets 11 U.S.C. § 523(a)(19) to render nondischargeable only those debts that arose from the debtor's personal violation of federal or state securities laws. Nothing in the plain language of § 523(a)(19), particularly when read together with the rest of the statute, supports such an interpretation. Instead, § 523(a)(19) must be read more broadly to encompass not only those debts that arose from the debtor's own violation of federal or state securities laws, but also those debts that are representative of violations of federal or state securities laws committed by others. Second, the majority fails to recognize that, even under its unduly narrow interpretation of § 523(a)(19), the judgment entered against the Wilcoxes in the Oklahoma state courts is nondischargeable because the Wilcoxes were found to have knowingly participated in violating Oklahoma state securities laws.

As a result of these differences, I would affirm the bankruptcy court's decision concluding that the Oklahoma state court judgment entered against Mathews was nondischargeable under § 523(a)(19). As for the Wilcoxes, I would remand to the district court with directions to remand the matter to the bankruptcy court for further proceedings. On remand, the bankruptcy court should treat the final judgment entered against the Wilcoxes in state district court as nondischargeable under § 523(a)(19).

# I

## *The underlying Ponzi scheme*

From approximately May 1992 through October 2004, Martha Schubert, an Oklahoma resident, worked as a registered agent of two registered investment broker-dealers in Oklahoma: AXA Advisors (from 1992 through May 2004) and Wilbanks Securities (from May 2004 to October 2004). As a registered agent, Schubert "plac[ed] investments [for clients] in legitimate accounts with recognized national brokerage houses." App. at 470. Beginning in or about 2001, Schubert, unbeknownst to AXA Advisors, began engaging in outside securities activities by offering and selling so-called Investment Program Interests to individual clients. "Schubert directed [i]nvestors to make their checks payable to her personally or to Schubert and Associates," id. at 262, an unincorporated association, id. at 470. "Schubert did not disclose to [i]nvestors how she would invest their money, but generally stated that the money would be used to make trades in option contracts," and she "promised that the investments were 'fool proof'" and would yield "thirty percent (30%) annual interest." Id. at 262. Schubert's program, however, was a sham. To begin with, "[t]he Investment Program Interests were not registered as securities under" Oklahoma law. Id. Further, "Schubert used new [i]nvestor money to pay principal and/or profits to [i]nvestors who had previously invested." Id. In short, Schubert's program was a Ponzi scheme.

"In April of 2004, AXA Advisors conducted an audit on Schubert regarding wire-fund activity involving her customers' brokerage accounts and deposits from . . . Schubert

and Associates." Id. at 261. "In May of 2004, AXA Advisors permitted Schubert to resign while she was still under investigation." Id. Following her resignation, Schubert began working for Wilbanks Securities. Schubert continued her fraudulent investment scheme, apparently while working for Wilbanks, until approximately October 2004.

In 2005, Schubert was indicted by a federal grand jury. Schubert subsequently pled guilty to a single count of money laundering and was sentenced to a term of imprisonment of 120 months.

*The state lawsuit against certain investors*

On May 11, 2005, the Oklahoma Department of Securities (ODS) filed suit against 158 individuals (described in the complaint as "Relief Defendants"), including Robert Mathews and Marvin and Pamela Wilcox, who had invested money with Schubert and in turn "received cash and other property and/or control property that [we]re the proceeds of the unlawful activities of . . . Schubert." Id. at 307. ODS's complaint alleged that the Relief Defendants "received . . . over $6,000,000 of the $9,000,000 lost in th[e] Ponzi scheme." Id. at 314. ODS asserted claims against the Relief Defendants under the Oklahoma Uniform Securities Act, Okla. Stat. tit. 71 § 1-101 et seq., for unjust enrichment.

ODS moved for summary judgment, alleging that each Relief Defendant "opened an investment account with AXA Advisors, with Schubert acting as investment advisor, and transacted certain purchases, sales and withdrawals in those accounts," id. at 473, and that "all monies received into [those] AXA accounts were accounted for in statements

3

provided by AXA, but that each [Relief Defendant] also received additional sums from commingled Schubert bank accounts without supporting statements," id.

On December 12, 2006, the state district court granted ODS's motion for summary judgment against Mathews and entered judgment against Mathews and in favor of the ODS. Less than two months later, on February 5, 2007, the state district court granted ODS's motion for summary judgment against the Wilcoxes and entered judgment against them and in favor of ODS. In each instance, the state district court entered judgment in favor of ODS in an amount equal to the additional sums received by Mathews and the Wilcoxes.

Some of the defendants in the state court action against whom judgments were entered, including the Wilcoxes but not Mathews, appealed to the Oklahoma Court of Civil Appeals (OCCVA). On April 13, 2007, the OCCVA "h[e]ld that, under [Oklahoma] laws, disgorgement may be ordered in securities cases against those other than actual violators of the Act, where such relief is appropriate under the facts and circumstances of the case," and that the ODS "[wa]s the proper party to bring such an action." Id. at 477. In turn, the OCCVA held that the state district court correctly granted summary judgment in favor of ODS on its unjust enrichment claims. The OCCVA noted that, aside from the amount each Relief Defendant deposited into his or her AXA account, each "received sums from Schubert which were purportedly profits from option contracts or day trading in securities." Id. at 487. However, the OCCVA noted, "[i]t [wa]s uncontroverted that such profits did not exist and the additional sums [the Relief

4

Defendants] received were instead fraudulently obtained from other investors with Schubert and Associates." Id. In short, the OCCVA concluded, the Relief Defendants were "in possession of funds which, in equity and good conscience, belong[ed] to other investors." Id.

*The federal court proceedings*

In 2007, following issuance of the OCCVA's decision, Mathews and the Wilcoxes filed for Chapter 7 bankruptcy. The ODS responded by filing adversary proceedings against Mathews and the Wilcoxes seeking "exceptions to the[ir] . . . discharges for fraud pursuant to 11 U.S.C. § 523(a)(2) and securities-related fraud pursuant to § 523(a)(19)." Id. at 571. In support, the ODS alleged that Schubert's Ponzi scheme included a "check exchange scheme," id., under which "Schubert would use other people's checking accounts to 'float' payments to investors as their purported profits." Id. at 571-72. The ODS further alleged that Mathews and the Wilcoxes "knowingly participated in the check exchange scheme by allowing Schubert to funnel money through their checking accounts," and thereby "materially aided Schubert in her securities fraud scheme." Id. at 572. Mathews and the Wilcoxes denied those allegations.

On December 12, 2008, the bankruptcy court granted summary judgment in favor of the ODS. In doing so, the bankruptcy court noted that the exception to dischargeability set forth in 11 U.S.C. § 523(a)(19) "has two elements: (1) a debt that is for a violation of state securities laws; and (2) that debt results from a judgment or order in a federal or state judicial proceeding." Id. at 574. The bankruptcy court in turn concluded that these

5

elements were satisfied with respect to Mathews and the Wilcoxes:

> A review of the opinion of the [OCCVA] makes clear that the disgorgement judgment against the Defendants was made pursuant to Oklahoma securities law. Although the Defendants strongly argue they were innocents caught in the web of Schubert's fraudulent scheme, it is of no legal consequence since Oklahoma law does not require wrongful intent. The Oklahoma Court of Civil Appeals explained, "We agree with the assertion by the Department . . . and Receiver that Appellants' . . . defense of being 'innocent victims' has no merit under the facts here. Appellants are in possession of funds which, in equity and good conscience, belong to other investors." Thus, the Plaintiff has clearly established that the debt is for a violation of Oklahoma securities law.

Id. at 575 (citation omitted).

Mathews and the Wilcoxes appealed from the bankruptcy court's decision and elected to have their appeals "heard by the United States District Court, Western District of Oklahoma." Id. at 586. Mathews and the Wilcoxes argued, in pertinent part, that "the Bankruptcy Court erred because § 523(a)(19) is limited to judgments resulting from the debtor's direct violation of the state securities law." Id. at 58. On February 10, 2010, the district court, reviewing the bankruptcy court's legal conclusions de novo, granted summary judgment in favor of the ODS and against Mathews and the Wilcoxes.

On March 5, 2010, Mathews and the Wilcoxes filed notices of appeal from the district court's judgment.

### The Oklahoma Supreme Court's Blair decision

During the pendency of the federal court proceedings, the defendants in the Oklahoma state proceedings who had unsuccessfully appealed to the OCCVA, including the Wilcoxes, sought certiorari review in the Oklahoma Supreme Court (OSC). The OSC

6

granted review and, on February 23, 2010, issued a published decision reversing the OCCVA's decision (the OCS's decision was subsequently corrected and reissued on April 6, 2010). Okla. Dep't of Securities ex rel. Faught v. Blair, 231 P.3d 645 (Okla. 2010) (Blair). The OSC held that the ODS "may proceed against the innocent investors to recover *unreasonable* profits received in excess of their investments in the Ponzi scheme." Id. at 649 (emphasis in original). Although the OSC "agree[d] with the [ODS] that the nature of the transaction between the Ponzi operator and innocent investor *may* be inequitable and the innocent investor's right to the funds becomes merely possessory," it "disagree[d] that the profit [wa]s, as a matter of law, inequitable and thereby subject to a restitution proceeding." Id. at 658 (emphasis in original). Instead, the OSC concluded, the ODS "must prove that an innocent investor's conduct of possessing a Ponzi-scheme profit is, *by itself*, active wrongdoing or possession against equity and good conscience sufficient to justify a constructive trust imposed by a District Court." Id. at 659 (emphasis in original). In that regard, the OSC concluded, the ODS "may seek relief against Ponzi investors who received profits that are artificially high dividends," but may not "seek restitution from innocent Ponzi-scheme investors who received their investment with a reasonable interest thereon." Id. at 663.

Applying its holdings to the facts presented, the OSC concluded that the state district court improperly granted summary judgment "based upon the principle that a profit to a Ponzi-scheme investor is, as a matter of law, unjust enrichment, and subject to an action by the [ODS] for restitution." Id. at 669. Accordingly, the OSC remanded the

7

action to the state district court "for further proceedings consistent with [the OSC's] opinion." Id. at 670.

*Post-Blair proceedings*

On remand from the OSC, the state district court, on October 18, 2010, granted partial summary judgment in favor of the ODS and against the Wilcoxes "on the issue of liability relative to [ODS's] cause of action for unjust enrichment." Aplee.'s Supp. Br., Exh. 1 at 2. In doing so, the state district court concluded that "by virtue of their participation in the Schubert check-kiting scheme, the Wilcoxes were not innocent investors and the standard for recovery from investors in Ponzi schemes set forth in Blair did not apply." Okla. Dep't of Sec. v. Wilcox, 267 P.3d 106, 109 (Okla. 2011).

The ODS subsequently "filed a second motion for summary judgment, asserting that further documentation received from the Wilcoxes demonstrated that no issue of material fact remained as to the amount the Wilcoxes netted from Schubert's Ponzi scheme." Id. "The Wilcoxes did not respond to the motion." Id. Consequently, on December 17, 2010, the state district court "entered judgment in favor of [the ODS] and against the Wilcoxes in the amount of $509,505.00, plus prejudgment and post-judgment interest and costs." Id. at 110.

The Wilcoxes appealed. On October 11, 2011, the OSC affirmed the judgment entered by the state district court, concluding "that there [wa]s no dispute of material fact justifying trial on th[e] issue" of whether the Wilcoxes were "'innocent' investors entitled to the equitable treatment provided to innocent investors in Blair." Id. at 111. In

8

reaching this conclusion, the OSC noted that the ODS "offered admissible evidence that the Wilcoxes were not 'innocent investors' or 'innocent victims' of the Ponzi scheme, but were in fact partners with Schubert whose bank accounts were actively used in Schubert's check-kiting scheme." Id. The OSC further noted that "[t]he Wilcoxes did not deny the existence of or their active participation in Schubert's check-kiting scheme." Id.

II

"Our review of the bankruptcy court's decision is governed by the same standards of review that govern the district court's review of the bankruptcy court." In re Roser, 613 F.3d 1240, 1243 (10th Cir. 2010) (internal quotation marks omitted). "Because this case presents no disputed factual issues but only matters of law, our review is de novo." Id.

Section 523(a)(19) of the Bankruptcy Code provides, in pertinent part, that a bankruptcy discharge:

> does not discharge an individual debtor from any debt–
> * * *
> (19) that–
>     (A) is for–
>         (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws . . . ; and
>     (B) results, before, on, or after the date on which the [bankruptcy] petition was filed, from–
>         (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
>         (ii) any settlement agreement entered into by the debtor; or
>         (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement

> payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. § 523(a)(19).

The majority summarily concludes that, under "the plain language of th[is] statute," "[t]he judgments at issue are not 'for a violation' of securities laws but for unjust enrichment resulting from someone else's violation of those statutes." Maj. Op. at 6. The majority also states, in a related footnote, that the ODS "chose not to prosecute Mathews or the Wilcoxes for securities violations." Id. at 5-6 n.5. Thus, in sum, the majority apparently reads § 523(a)(19) as requiring the debt at issue to have arisen from the debtor's personal violation of federal or state securities laws.

In my view, this is an unduly restrictive reading of § 523(a)(19). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 175 (2009) (internal quotation marks omitted). As noted, § 523(a)(19) prohibits, in pertinent part, the discharge in bankruptcy of "any debt . . . that . . . is for . . . the violation of . . . any of the State securities laws." 11 U.S.C. § 523(a)(19). The word "debt" "is defined in the [Bankruptcy] Code as 'liability on a claim,' § 101(12), a 'claim' is defined . . . as a 'right to payment,' § 101(5)(A), and a 'right to payment,' [the Supreme Court has] said, 'is nothing more nor less than an enforceable obligation.'" Cohen v. de la Cruz, 523 U.S. 213, 218 (1998) (quoting Penn. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 559 (1990)). In turn,

10

the word "for" means "[r]epresenting" or "as representative of," Oxford English Dictionary (2d ed. 1989) (online version); see Cohen, 523 U.S. at 220-21 (concluding that the phrase "debt for," as used in § 523(a), "means 'debt arising from' or 'debt on account of'"), and the word "violation" refers to an "[i]nfringement," "breach," or "flagrant disregard or non-observance," Oxford English Dictionary (2d ed. 1989). Considered together, § 523(a)(19) thus refers to every enforceable obligation of the debtor to another that represents or is representative of an infringement or breach of "any of the Federal securities laws . . . , any of the State securities laws, or any regulation or order issued under such Federal or State securities laws." See generally Cohen, 523 U.S. at 220 (concluding that "'debt for' is used throughout [§ 523(a)] to mean 'debt as a result of,' 'debt with respect to,' 'debt by reason of,' and the like.").

As so defined, nothing in the statutory language of § 523(a)(19) limits the scope of nondischargeable obligations to those arising out of federal or state securities violations committed by the debtor. More specifically, it is entirely possible for an obligation — in particular a court judgment for unjust enrichment — to represent or be representative of a federal or state securities violation committed by someone other than the person against whom the judgment was entered. Had Congress intended to limit the scope of § 523(a)(19) to only those obligations arising out of the debtor's personal violation of federal or state securities laws, it would have said so. Indeed, a review of some of § 523(a)'s other subsections confirms this. For example, § 523(a)(6) renders nondischargeable any debt "for willful and malicious injury by the debtor to another

11

entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (emphasis added).

Similarly, § 523(a)(9) renders nondischargeable any debt "for death or personal injury

caused <u>by the debtor's</u> operation of a motor vehicle if such operation was unlawful

because the debtor was intoxicated from using alcohol, a drug, or another substance." 11

U.S.C. § 523(a)(9) (emphasis added). Because Congress did not include any such

limiting language in § 523(a)(19), the only reasonable conclusion is that Congress

intended § 523(a)(19) to be broad enough to encompass circumstances in which the

debtor personally violated federal or state securities laws, as well as circumstances in

which a third party has violated federal or state securities laws and the debtor, for one

reason or another, has been held financially responsible for that violation.

The majority, obviously finding no support for its interpretation in the language of

§ 523(a)(19) itself, cites to the legislative history. To the extent the legislative history is

relevant, it is as, if not more, supportive of my interpretation than the majority's.

Subsection (a)(19) was added to § 523 in 2002 by the Sarbanes-Oxley Act of 2002, Pub.

L. No. 107-204, § 803(3), 116 Stat. 745.[1] The overall focus of that Act, which was

introduced in the wake of the Enron and other corporate scandals, was to "restore

[corporate] accountability" by "provid[ing] prosecutors with new and better tools to

effectively prosecute and punish those who defraud our Nation's investors," "provid[ing]

tools [to] improve the ability of investigators and regulators to collect and preserve

---

[1] The Act was also known in the Senate as the Public Company Accounting Reform and Investor Protection Act, and in the House as the Corporate and Criminal Fraud Accountability Act of 2002.

12

evidence which proves fraud," and "protect[ing] victims' rights to recover from those who have cheated them." 148 Cong. Rec. S1783-01, S1786 (2002). As I see it, it is entirely consistent with the Act to treat as nondischargeable any debts that arose from violations of federal or state securities laws, regardless of whether or not the debtor was personally involved in those violations. Indeed, to hold otherwise would result in a windfall to the debtor. And, although there are certainly comments in the legislative history indicating that Congress's prime focus in enacting § 523(a)(19) was to prevent "corporate officers" from "be[ing] able to misuse the bankruptcy laws to discharge liabilities based upon securities fraud," 148 Cong. Rec. H4683-01, H4685 (2002), nothing in the legislative history or, more importantly, the text of the statute, indicates that Congress intended to allow so-called innocent investors to effectively benefit from those, or similar, securities violations.

Lastly, the majority cites with approval the Ninth Circuit's decision in Sherman v. SEC, 658 F.3d 1009 (9th Cir. 2011). The panel in Sherman, in a 2-to-1 decision, held "that § 523(a)(19) only prevents the discharge of a debt for a securities violation when the debtor is responsible for that violation." 658 F.3d at 1012. In support, the panel majority in Sherman relied not on § 523(a)(19)'s "text and structure," which it found inconclusive, but rather on a combination of "a rule of construction interpreting exceptions to discharge narrowly," id. at 1015, and what it characterized as "modest additional support for [its] interpretation" in "[t]he legislative history of § 523(a)(19)," id. at 1016.

In my view, the dissenting opinion in Sherman is substantially more persuasive

13

and properly takes the Sherman majority to task for "disregard[ing] the plain meaning of .

. . § 523(a)(19)." Id. at 1019.  As the dissent correctly notes, a debt can be "for the

violation of any of the Federal securities laws," § 523(a)(19)(A)(i), "when the debtor

[personally] committed the violation" or "when it is an obligation to return the proceeds

of the violation being held in trust for the wrongdoer," 658 F.3d at 1019 (emphasis

omitted).  By construing § 523(a)(19) narrowly to encompass only the first of these

possibilities, the panel majority in Sherman "misconstrues the plain text [of the statute],

distorts the statutory structure and actually defeats the proper objectives of bankruptcy

policy and the securities laws." Id. at 1029.

Having outlined what I believe to be the proper interpretation of § 523(a)(19), the

next task is to apply that interpretation of § 523(a)(19) to the facts presented in these

consolidated appeals.  Turning first to Mathews' appeal, it is undisputed that the state

district court entered judgment against him and in favor of the ODS for unjust enrichment

under the Oklahoma Uniform Securities Act, and that Mathews did not appeal from this

judgment.  Although the state district court did not make any findings that

Mathews was directly involved in the underlying violations of Oklahoma state securities

laws, it is beyond dispute that the judgment entered against Mathews was intended to be

representative of the infringement of Oklahoma state securities laws committed by

Schubert.[2]  Consequently, that judgment falls within the scope of § 523(a)(19) and is not

_____

[2] To be sure, the judgment against Mathews was entered prior to, and thus is not consistent with, the OSC's decision in Blair.  But, as noted, Mathews did not appeal from
(continued...)

14

dischargeable in Mathews' bankruptcy proceedings.

The Wilcoxes' appeal presents a different situation. The judgment that was originally entered against the Wilcoxes was reversed by the OSC in Blair and remanded to the state district court for further proceedings. On remand, the state district court granted summary judgment in favor of the ODS, finding that the undisputed evidence established "that by virtue of their participation in the Schubert check-kiting scheme, the Wilcoxes were not innocent investors." Wilcox, 267 P.3d at 109. The state district court further "entered judgment in favor of [ODS] and against the Wilcoxes in the amount of $509,505.00, plus prejudgment and post-judgment interests and costs." Id. at 110. On appeal, the OSC affirmed that judgment, noting, in pertinent part, that "[t]he Wilcoxes did not deny the existence of or their active participation in Schubert's check-kiting scheme." Id. at 111.

Accordingly, I believe the appropriate course of action is to remand the Wilcoxes' appeal with directions to the bankruptcy court to treat the judgment entered in favor of the

---

[2](...continued)
the judgment, and there is no indication in the record on appeal that he has sought, let alone been granted, relief from the judgment based upon Blair.

ODS and against the Wilcoxes as nondischargeable under § 523(a)(19).[3]

---

[3] The judgment entered against the Wilcoxes should also, in my view, be considered nondischargeable under the majority's narrow interpretation of § 523(a)(19), given the state district court's finding regarding the Wilcoxes' knowing involvement in Schubert's criminal scheme. The same would also be true under the <u>Sherman</u> majority's similarly narrow interpretation of § 523(a)(19). <u>See</u> 658 F.3d at 1019 (holding that "§ 523(a)(19) prevents the discharge of debts for securities-related wrongdoings . . . where the debtor is responsible for that wrongdoing").

16